J-S05043-25          2025 PA Super 95

| | | |
|---|---|---|
| IN RE: E.J.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3004 EDA 2024 |

Appeal from the Decree Entered October 11, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0049

| | | |
|---|---|---|
| IN RE: Z.K.-E.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.C., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3005 EDA 2024 |

Appeal from the Decree Entered October 11, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2024-0003

BEFORE:   BOWES, J., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED MAY 2, 2025**

Appellant, C.C. ("Father"), appeals from the October 11, 2024 decrees

that involuntarily terminated his parental rights to his daughter, E.J.C., born

_____

[*] Former Justice specially assigned to the Superior Court.

in November of 2011, and son, Z.K.-E.C. (collectively, "the Children"), born in November of 2010.[1, 2]  After careful review, we affirm.

The orphans' court wrote separate opinions, one for each child, in which it set forth extensive factual findings.  **See** Orphans' Court Opinion ("O.C.O.") (E.J.C.), 10/11/24, at ¶¶ 1-246; O.C.O. (Z.K.-E.C.), 10/11/24, at ¶¶ 1-253. Because the record supports the court's factual findings, we adopt them herein.

By way of background, Parents share nine daughters and four sons. Parents' parental rights to their six youngest children were involuntarily terminated following a hearing on February 12, 2024, based upon termination petitions filed by the Northampton County Children, Youth, and Families Division ("CYF" or "the Agency").[3]  Father appealed the six termination decrees, which a prior panel of this Court affirmed pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b) on July 29, 2024.  **See In re K.O.C.**, 324 A.3d 1268,

_____

[1] The parental rights of J.C., the Children's mother ("Mother") (collectively with Father, "Parents"), were also involuntarily terminated by separate decrees on October 11, 2024.  Mother appealed the termination decrees, which we address in a separate memorandum at 3034-35 EDA 2024.

[2] The Children, through their legal interest counsel, have also filed separate appeals from the decrees.  We address the Children's appeals in a separate memorandum at 3036-37 EDA 2024.

[3] CYF did not file termination petitions as to the five oldest children based on their ages.

2024 Pa. Super. Unpub. LEXIS 1855 (Pa.Super. 2024) (unpublished memorandum).

A prior panel of this Court set forth the relevant factual and procedural history of this case as follows:

> Mother has two older children [from different paramours, both of whom are older than the thirteen children she shares with Father], including [her son] D.G., who was born in 2004. [Parents] supported their household solely with government benefits. After their house burned down in 2017, the family moved into a multi-story rowhouse with one bathroom at 714 Broadway in Bethlehem.
>
> In 2021, [Parents], their thirteen minor children, D.G., and at least two dogs were living in the 714 Broadway home. Notably, four of the older boys shared a room, the older girls shared a room, [Parents] and the three youngest children shared a room, and D.G. lived in the attic. Two of [Parents'] older daughters, S.C. and T.C., told [Parents] that D.G. was sexually abusing them. Father did not contact law enforcement, but instead installed cameras in the home, put locks on the girls' bedroom door, and sent the six girls . . . to stay with his mother, while Mother investigated the allegations made against D.G. As Father did not see anything concerning on the cameras, and Mother did not believe her older daughters, the girls returned to the 714 Broadway home in the fall of 2021.
>
> In October [of] 2021, CYF received a child protective services ("CPS") referral of alleged sexual abuse by D.G. CYF had additional concerns of . . . deplorable home conditions at 714 Broadway. CYF child abuse investigator, Heather Major, accompanied the Bethlehem police to 714 Broadway in the evening on October 27, 2021. Major found that her shoes stuck to the grime on the floor as they toured the home and the odors throughout were unbearable. She found the home contained flies; the kitchen contained rotting

food, a container filled with six inches of yellow fluid that smelled like urine, and was infested with insects; mushrooms were growing in the basement; there was mold throughout the home; and one room had animal waste. Additionally, Major noted that two entire rooms contained Mother's hoarded baby clothing and other items.

After CYF sought to establish a safety plan, [Parents] agreed to a plan for twenty-four hours that required Mother to leave the home with the three youngest children, moved D.G. in with his grandmother, and Father to stay in the home with the remaining ten children. Subsequently, Major and the police brought S.C. and T.C. to the police station for forensic interviews. The girls disclosed multiple incidents of sexual abuse and disclosed messages they had sent to [Parents] detailing the abuse. Based upon Major's home visit and interviews disclosing the sexual abuse, CYF obtained thirteen emergency orders for protective custody due to [Parents'] lack of protective capacities and ability to control the [c]hildren, and the state of the home.[4] CYF was unable to place the thirteen children together, and instead placed them into groups of two or three in separate foster homes.

On October 29, 2021, D.G. admitted to sexually abusing [a total of nine of his] siblings during an interview with the police. Some of the children subsequently confirmed that they had either been sexually abused by D.G. or observed D.G. abusing their siblings.[4] On November 2, 2021, the Commonwealth charged Father with multiple criminal counts, including endangering the welfare of children [("EWOC")]. Father was imprisoned in Northampton County Prison in lieu of $500,000 bail. CYF then filed thirteen petitions for the adjudication of dependency and disposition orders requesting removal. On November 12, 2021, the Hearing Officer confirmed the adjudication [and] removal of the thirteen children

_____

[4] Parents' home at 714 Broadway was condemned by the city shortly after the Children were removed.

> based on the findings of abuse, neglect, and dependency, and that it was in the best interests of the thirteen children to be removed from [Parents'] care.
>
> [4] The police arrested D.G. and the Commonwealth charged him with numerous crimes. D.G. ultimately [pleaded] guilty to seven counts of indecent assault of a child less than thirteen years of age. The trial court sentenced D.G. to seven to fourteen years in prison, followed by seven years of probation.

*Id.* at *3-6 (some footnotes omitted).

E.J.C. was one of the nine children subjected to sexual abuse by D.G. *See* Notes of Testimony ("N.T.") (Vol. I), 2/12/24 at 99-104. Z.K.-E.C., while not subjected to sexual abuse by D.G., witnessed the sexual abuse of his siblings by D.G. *See id.* at 96.

According to CYF caseworker Ms. Major, when interviewed in October of 2021, Father reported "that he had heard something" about the sexual abuse allegations, but he did not "fully know or understand anything." *Id.* at 91. He admitted he knew about the sexual abuse "over the summer" of 2021. *Id.* at 91. After being made aware of the sexual abuse, Father ultimately allowed the alleged sexual abuser, D.G., to continue to reside in the family home with all of his children until the Agency intervened. *See id.* at 69-71, 91-93.

Father was indicated as a perpetrator of abuse by omission as to seven of the children, including E.J.C.[5]  **See id.** at 99-103.

Father was released from prison on reduced bail in February of 2022. As a condition of his release, he was ordered to have no visitation with the Children and their siblings.  In November of 2022, Father pleaded guilty to EWOC.  He received a sentence of three to twelve months incarceration, with credit for his time served.  As best we can discern, Father was not further incarcerated.  Father's sentence also included a provision that he was to have no contact with the Children and their siblings unless approved by the Agency. Father resided with the Children's paternal grandmother following his release from jail.

Following the Children's dependency adjudication in November of 2021, the court established their permanency goals as reunification with concurrent goals of adoption.  In furtherance of reunification, Father was ordered to, **inter alia**: complete a comprehensive parenting capacity evaluation and follow all resulting recommendations; and maintain legitimate, stable housing for a period of at least six months.

The record reveals that the Agency approved supervised visitation to begin with Father, the Children, and their siblings sometime in early 2023.

_____

[5] Father was not indicated as to two of the children where the Agency determined the abuse occurred only before he was made aware.  **See** N.T. (Vol. I), 2/12/24 at 99-104.  Father appealed his indication as to one of the siblings, H.C., and won that appeal.  **See id.** at 103.

*See* N.T. (Amended Vol. II), 2/12/24 at 131-32, 134-35. The Agency facilitated large family visits with Parents, the Children, and all eleven of their siblings, along with smaller group visits that included Parents and a few of their children at a time.

During E.J.C.'s dependency, the Agency transferred her placement approximately nine times due to behavioral problems, including an inappropriate sexual relationship with another child in a placement, which we discuss *infra*. At the time of the subject hearings, E.J.C. was residing in a group home. Z.K.-E.C. has remained in the same pre-adoptive foster home placement, with one of his brothers, since his removal in October of 2021.

On July 13, 2023, the Agency filed petitions to involuntarily terminate Father's parental rights to the Children and their six younger siblings pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The petition with respect to E.J.C. additionally pleaded grounds for termination under Section 2511(a)(10). On February 9, 2024, the orphans' court appointed Brian Lawser, Esq., to represent the legal interests of the Children, who were then ages twelve and thirteen.[6]

_____

[6] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a). *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). In this case, the court complied with the requirements of 23 Pa.C.S.A. § 2313(a).

The court held evidentiary hearings on the petitions on February 12 and April 24, 2024, and it re-opened the record for additional evidence on September 6, 2024. In each of the proceedings, the Children were represented by Attorney Lawser and their best interests were represented by their guardian *ad litem* ("GAL"), Leonard Mellon, Esq.

On February 12, 2024, Parents separately testified. CYF presented the testimony of Ms. Major; Shakira Roseway, the Agency caseworker from July of 2022, through October of 2023; and Jennifer Lorah, the Agency caseworker from October of 2023, through the termination hearings.

According to Ms. Roseway, E.J.C. was opposed to adoption. *See* N.T. (Amended Vol. II), 2/12/24 at 147. Ms. Lorah, the current caseworker, clarified that E.J.C. desired to be reunified with her sisters. *See id.* at 170, 195, 207-08. Ms. Lorah testified that Z.K.-E.C. also expressed opposition to adoption. *See id.* at 172, 174, 194-95.

On April 24, 2024, CYF again presented the testimony of its caseworker Ms. Lorah. Parents again separately testified. The court did not issue an immediate ruling.

Upon the joint petition of Parents and the Children for "various reasons," which was unopposed by the Agency, the court re-opened the record and held another evidentiary hearing on September 6, 2024. O.C.O. (E.J.C.) at 26; O.C.O. (Z.K.-E.C.) at 27. Father failed to appear for this hearing but was represented by his counsel. As one of the petitioning parties, Mother testified

on behalf of Parents.[7]  CYF presented the testimony of Ms. Lorah, as well as Abbegail Carlin, who was E.J.C.'s counselor at her group home.

By decrees dated and entered on October 11, 2024, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  In addition, the court terminated Father's parental rights to E.J.C. pursuant to Section 2511(a)(10).

Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  The orphans' court filed its Rule 1925(a) opinions on November 14, 2024, wherein it relied on its extensive, separate opinions for the Children, which accompanied the termination decrees.  On December 4, 2024, this Court **sua sponte** consolidated Father's appeals pursuant to Pa. R.A.P. 513.

On appeal, Father presents the following issues for our review:

> A.  Whether the [orphans'] court failed to adequately consider the "Other consideration[s]" prong of 23 Pa.C.S.A. § 2511(b)[?]  Specifically, the court in

---

[7] As discussed **infra**, we analyze Father's termination decree under Section 2511(a)(8).  The court declined to consider the evidence presented by Mother at the September 6, 2024 hearing inasmuch as it concerned Parents entering into a lease agreement after the April 24, 2024 hearing. **See** O.C.O. (E.J.C.) at 31; O.C.O. (Z.K.-E.C.) at 31.  As this effort was clearly initiated after Father received notice of the termination petition on July 14, 2023, the court was prohibited from considering this evidence as to Father's housing. **See** 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."); Affidavit of Service Upon Father, 8/2/23.

"terminating parental rights shall give primary consideration to the developmental, physical and emotional need[s] and welfare of the minor children. The right[s] of the parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent."

B.      Whether the [orphans'] court['s] [] termination[] of parental rights of [] Father to [] the [] Children, at their respective ages (12) and (13)[,] has served, absent their consent to adoption, to render them orphans [in] perpetuity[?]

Father's Brief at 5 (unnecessary capitalization omitted).[8, 9]

Our standard of review in this context is well-established:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[8] We have reordered Father's issues for ease of disposition.

[9] The Children's legal counsel filed a brief requesting that this Court reverse the subject decrees. In contrast, the GAL filed a brief advocating for this Court to affirm the decrees.

> The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If the competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.

*In re R.A.M.N.*, 230 A.3d 423, 427 (Pa.Super. 2020) (internal quotation marks and citations omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the eleven enumerated grounds of parental conduct that may warrant termination. *See* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). For the following reasons, we conclude that the certified

record supports the orphans' court's determinations under 23 Pa.C.S.A. § 2511(a)(8) and (b), which provide as follows:[10]

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that:

(1) the child has been removed from the parent's care for at least 12 months;

_____

[10] Given our disposition relative to Section 2511(a)(8), we need not review and make no conclusions as to the orphans' court's findings with respect to Section 2511(a)(1), (2), (5), and (10). **See B.L.W.**, 843 A.2d at 384.

- 12 -

(2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is **imminent** at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009) (emphasis added).

Relevant to the third prong of Section 2511(a)(8), this Court has explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*).

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267.

- 13 -

Our Supreme Court has outlined this inquiry as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-1106 (Pa. 2023) (internal citations, quotations, and footnotes omitted).

The Court further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.* at 1109. The "severance of a necessary and beneficial relationship [is] the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10. Bond, permanency, stability, and all other intangible are "all of 'primary' importance in the Section 2511(b) analysis." *Id.* at

- 14 -

1109. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010).

Moreover, in considering the affection which a child may have for his or her natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Further, this Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *Interest of M.E.*, 283 A.3d 820, 839 (Pa.Super. 2022). Thus, we will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *See id.*

Instantly, Father does not present an issue with respect to Section 2511(a) in his statement of questions involved in his brief. **See** Father's Brief at 5. Therefore, we conclude that Father waived any arguments with respect to Section 2511(a). **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa.Super. 2017) (reiterating that appellate courts will not consider "any issue that has not been set forth in or suggested by an appellee brief's statement of questions involved"); Pa. R.A.P. 2116.

Even if not waived, we would conclude that the record supports the orphans' court's findings that termination of Father's parental rights was warranted pursuant to Section 2511(a)(8). Preliminarily, we note that the Children had been removed from Father's care for twenty-eight months at the start of these termination proceedings. Therefore, the first element of Section 2511(a)(8) is met.

Turning to the second prong of Section 2511(a)(8), we highlight the egregiousness of the primary condition that led to the removal of the Children from Father's care, that is, his failure to protect them from the sexual abuse at the hands of D.G. The certified record indicates that Father's protective capacity did not improve during the lifetime of these proceedings. Although he completed protective parenting classes, he never progressed past supervised visitation due to ongoing concerns about his lack of supervision. **See** N.T. (Amended Vol. II), 2/12/24 at 132, 156, 179, 183, 190, 194-195, 202-203. Specifically, Ms. Roseway and Ms. Lorah testified that Father

repeatedly failed to redirect inappropriate behavior between the Children and their siblings during the aforementioned large and small group supervised visits. **See** *id.* at 132, 183, 194-195, 202-203. This inappropriate behavior included physical fighting and "tak[ing] videos of themselves in positions" which we infer from the record were sexual in nature. *Id.* at 194-95.

Further, Father failed to maintain adequate and verified housing. The record evidence showed that Father resided with the Children's paternal grandmother at the time of the subject proceedings. **See** N.T. (Amended Vol. II), 2/12/24 at 136-137, 184-185; N.T., 4/24/24 at 24. Ms. Roseway testified that the paternal grandmother's home was rented. **See** N.T. (Amended Vol. II), 2/12/24 at 137. Ms. Roseway and Ms. Lorah stated that, despite multiple requests, Father never provided the Agency with the lease to demonstrate that he would be permitted to reside there with the Children. **See** N.T. (Amended Vol. II), 2/12/24 at 140, 187-189, 207; N.T., 4/24/24 at 41. Ms. Lorah testified that Father's housing would not be considered stable without this verification, as the Agency required evidence of a "legally binding contract to live in that home." N.T., 4/24/24 at 58; *see also* N.T. (Amended Vol. II), 2/12/24 at 210.

Based on the foregoing evidence, the record clearly supports the orphans' court's finding that the conditions of the Children's removal, namely Father's lack of protective capacity and inadequate housing, continued to exist at the time of the termination proceeding. Indeed, reunification was not

imminent at the time of the hearings as Father had never progressed past supervised visitation over the life of the Children's dependencies. ***See I.J.***, 972 A.2d at 11; N.T. (Amended Vol. II), 2/12/24 at 156-157. Therefore, even if not waived, the record would support the orphans' court's finding that the conditions which led to the Children's removal from Father's care continued to exist.

With respect to the third prong of Section 2511(a)(8), ***i.e.***, that termination would best serve the Children's needs and welfare, we would conclude that the record evidence supports the orphans' court's findings. The record reveals that Father's supervised visitation with the Children began over a year after their removal. ***See*** N.T. (Amended Vol. II), 2/12/24 at 131-132, 134-135. Ms. Roseway testified that the Children's foster parents reported behavioral concerns after visitation with Father, which only started after visitation with Father commenced. ***See id.*** at 154-156. Specifically, Ms. Roseway confirmed that thirteen-year-old Z.K.-E.C. had suffered from bedwetting throughout his dependency, which increased once visitation with Father began. ***See id.*** at 155. Accordingly, even if not waived, we would discern no abuse of discretion or error of law in the orphans' court's finding that termination of Father's parental rights was warranted pursuant to Section 2511(a)(8).

Turning to Father's first claim, his challenge to Section 2511(b), Father contends that CYF did not meet its evidentiary burden. ***See*** Father's Brief at

25-26. Father baldly asserts that his love for the Children, along with his attempts to comply with the Agency's requirements, "outweigh" the orphans' court's finding that termination best serves the needs and welfare of the Children. *Id.* at 26. This argument lacks legal merit.

Father's bald assertion that his love and personal considerations should take precedence over the needs and welfare of the Children under this subsection is blatantly contrary to our case law. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) ("A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights.") (internal citation omitted); *K.T.*, 296 A.3d at 1105 ("[C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare **above concerns for the parent**.") (emphasis added).

Upon thorough review, we conclude that the court did not abuse its discretion under Section 2511(b). We emphasize that the court found that the bonds between Father and the Children, who were ages twelve and thirteen by the time the proceedings concluded, were "unhealthy." O.C.O. (E.J.C.) at 45-46; O.C.O. (Z.K.-E.C.) at 44-45. The orphans' court's findings are well-supported by the record evidence.

Initially, we note that the Children have been placed apart from each other since the time of their initial removal in October of 2021. With respect to E.J.C., she had been moved through multiple placements during this time

period. The record reveals that, in the last three years, E.J.C. had been placed in five different foster homes, one residential facility placement, one shelter placement, one hospitalization, and resided in her current group home at the time of the subject proceeding. *See* CYF Exhibit, 4/24/24, [E.J.C.] 1. These placement transfers were due to E.J.C.'s poor behavior, which included assaulting teachers at school, physical aggression against another child in a placement, an inappropriate sexual relationship with another child in a placement, destroying placement property, and running away from placements. *See* CYF Exhibit, 4/24/24, [E.J.C.] 1; N.T., 9/6/24 at 27. In contrast, Z.K.-E.C. has remained in one consistent, pre-adoptive foster home. *See* N.T., 4/24/24 at 55.

Ms. Roseway testified that Father would tell the Children "things that were not exactly true" during supervised visits. N.T. (Amended Vol. II), 2/12/24 at 145, 153-514. For example, Father would provide the Children false timelines on when they would return to his care and repeatedly told E.J.C. that she was "going to be with family" when she expressed that she wanted to stay in foster care. *Id.* at 144-145, 147. Ms. Roseway stated that the Agency received reports that Father told the Children to be "disruptive" in their foster homes and that they did not have to listen to their foster parents. *Id.* at 154. Ms. Lorah corroborated observing similar issues when she supervised visits with Father and the Children. *See* N.T. (Amended Vol. II), 2/12/24 at 179; N.T., 4/24/24 at 26. She reported that Father's discussions

with the Children included telling them that they would have cell phones and different rules than their foster homes if they reunified. **See** N.T. (Amended Vol. II), 2/12/24 at 182. Ms. Lorah confirmed these types of conversations constituted Father making "false representations" that would negatively impact the Children. **Id.** at 206-207.

Ms. Roseway testified that the Children were excited to see Father at supervised visitation but demonstrated no sadness leaving him at the end of the visits. **See id.** at 151-152. She testified that the Children's interactions with Father were "very limited," and they did not "try to engage" with him inasmuch as the Children primarily focused on each other and their siblings during visits. **Id.** at 146, 151. Indeed, Ms. Roseway stated that the Children were upset to leave each other and their siblings at the end of visits. **See id.** at 151-152.

With respect to E.J.C.'s preferences regarding the involuntary termination of Father's parental rights, Ms. Roseway testified that although twelve-year-old E.J.C.'s desires initially wavered between wanting to reunify or stay in foster care, she did not want Father's parental rights terminated and did not want to be adopted. **See id.** at 147. However, Ms. Lorah, who was the Children's most current caseworker, testified that E.J.C. did not report specific wishes as to termination, but unequivocally wanted to be reunified with two of her sisters. **See id.** at 170, 195, 207-208.

As to Z.K.-E.C., the record revealed that he repeatedly expressed his opposition to adoption. *See* N.T. (Amended Vol. II), 2/12/24 at 172, 174, 194-195; N.T., 4/24/24 at 27, 44-45, 48. Nevertheless, Ms. Lorah testified that this opposition was because he did not want to change his last name. *See* N.T., 4/24/24 at 55. In addition, Ms. Lorah further testified that Z.K.-E.C. did not want Father to "have a say" in making decisions for him and did not want to be forced to "go back home" or attend visitation. N.T. (Amended Vol. II), 2/12/24 at 195-96. Z.K.-E.C. wanted to either stay in his foster placement with one of his brothers, or live with his paternal grandmother because his minor uncle, who was Z.K.-E.C.'s age, resided with her. *See* N.T. (Amended Vol. II), 2/12/24 at 195-196; N.T., 4/24/24 at 26, 44. Ms. Lorah testified that Z.K.-E.C. experienced anxiety about being separated from his foster home, "even for a brief respite visit." N.T., 4/24/24 at 54. Ms. Lorah testified that, when asked to list the people he was closest to in his life, Z.K.-E.C. indicated his foster mother. *See id.* at 56.

To the extent that the Children's expressed desires were in opposition of termination of Father's parental rights, the record evidence supports the court's decision that termination would best serve the Children's needs and welfare.[11] As discussed above, the Children's opposition to adoption did not

_____

[11] The GAL filed an appellate brief advocating for affirmance of the decrees. The GAL argues that the court correctly prioritized the Children's needs and welfare over the Children's preferences. *See generally* GAL's Brief. Further,
*(Footnote Continued Next Page)*

stem from any bonds with Father. Further, the orphans' court considered the Children's desires in its analysis of their needs and welfare, as follows:

> The [c]ourt has considered [the Children's] relayed wishes, but we must make our determination based upon the Child[ren]'s best interests, even if that means being unable to grant [their] stated wishes.

O.C.O. (E.J.C.) at 33; O.C.O. (Z.K.-E.C.) at 34.

The certified record supports the orphans' court's conclusion that the bond between Father and the Children was not "necessary and beneficial," as to preclude termination of his parental rights. **K.T.**, 296 A.3d at 1109-1110. Further, Father's biological connection or any affection that the Children may hold for him, despite the sexual abuse that they endured and/or witnessed due to his failure to protect them, does not establish the type of bond as to preclude termination of his parental rights. **See K.K.R.-S.**, 958 A.2d at 535 (reiterating a child's feelings are not a "dispositive factor" when assessing a bond and the "psychological aspect of parenthood" trumps a biological connection).

The orphans' court was well within its discretion to prioritize the Children's safety and security after nearly three years in placement. **M.E.**, 283 A.3d at 839. Accordingly, we discern no error or abuse of discretion in

─────────────────────────────

the GAL asserts that the Children do not share a necessary and beneficial bond with Father. **See id.** at 4-8.

the orphans' court's conclusion that the Agency met its evidentiary burden pursuant to Section 2511(b).

We now turn to Father's final issue, wherein he asserts that the record shows that the Children will not consent to adoption pursuant to 23 Pa.C.S.A. § 2711. ***See*** Father's Brief at 33-34; ***see also*** N.T., 9/6/24 at 78-80 (the Children's legal counsel arguing on the record in open court that termination would "essentially mak[e] legal orphans of [the C]hildren" because they were opposed to adoption, to which Father's counsel "agree[d]"). Therefore, he argues that the court erred and abused its discretion in terminating his parental rights. ***See id.*** We disagree.

Section 2711 provides in pertinent part, as follows:

> **§ 2711.  Consents necessary to adoption.**
>
> **(a) *General rule.* –** Except as otherwise provided in this part, consent to adoption shall be required by the following:
>
> (1)   The adoptee, if over 12 years of age.

23 Pa.C.S.A. § 2711(a)(1).

Significantly, Father provides no statutory authority or case law, and we are aware of none, to support his proposition that the Children's consent to adoption is a required element to the involuntarily termination of parental rights under Section 2511(a) and (b). Since the Agency filed the underlying termination petitions in the above-captioned cases, there was no requirement that an adoption need be contemplated. ***See*** Pa.C.S.A. § 2515(b)(3). In this

case, Section 2511 set forth the relevant grounds required for termination, which does not include Section 2711 consent. Indeed, since no adoption petition was pending before the orphans' court, the Children were not even "adoptees" under the statute cited by Father.

In addition, the record is devoid of evidence that the Children would not consent under Section 2711 following the termination of parental rights. As such, Father's argument is purely speculative and legally specious. Accordingly, as Father's arguments lack factual and legal merit, this issue fails. Thus, we affirm the decrees that involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/2/2025